# Illinois Official Reports

## Appellate Court

***Doe v. Boy Scouts of America*, 2014 IL App (2d) 130121**

| | |
|---|---|
| Appellate Court Caption | JANE DOE, as Mother and Next Friend of John Doe, a Minor, Plaintiff-Appellant, v. BOY SCOUTS OF AMERICA and BLACK-HAWK AREA COUNCIL OF BOY SCOUTS OF AMERICA, Defendants-Appellees (Charles Bickerstaff, Defendant). |
| District & No. | Second District<br>Docket No. 2-13-0121 |
| Filed | January 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld the entry of summary judgment for two boy scout organizations in plaintiff's action alleging that the organizations were negligent in screening, hiring, and retaining a man who sexually assaulted her son after the man's employment with the organizations had been terminated, since she cited no authority for imposing liability on the organizations for an employee's posttermination actions, and even if such liability was recognized, plaintiff did not raise any issue of material fact that would bar summary judgment; furthermore, the appellate court rejected plaintiff's claims that defendants were liable under a voluntary undertaking or voluntary custody theory. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 07-L-405; the Hon. Eugene G. Doherty, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal    Mark R. McKenna and Evan M. Smola, both of Hurley, McKenna & Mertz, P.C., of Chicago, for appellant.

Robert Marc Chemers, John J. Walsh III, David C. McMurtrie, and Scott L. Howie, all of Pretzel & Stouffer, Chtrd., of Chicago, for appellee Boy Scouts of America.

Dana C. Crowley, of Dana Crowley & Associates, of Barrington, and L. Anita Richardson, of Dana Crowley & Associates, of Chicago, for appellee Blackhawk Area Council of Boy Scouts of America, Inc.

Panel    JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hudson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Jane Doe, as mother and next friend of John Doe (John), a minor, appeals from the trial court's granting summary judgment in favor of defendants, Boy Scouts of America (BSA) and the Blackhawk Area Council of Boy Scouts of America (BAC), on plaintiff's negligence claims against them. (Plaintiff also brought negligence and battery claims against former BAC employee Charles Bickerstaff, which are not involved in this appeal.) For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    BSA is a national youth organization whose vision is implemented through local councils that it charters. The councils are divided into districts. BAC is one such council. There is no dispute in this litigation that BSA and BAC are legally separate organizations with separate employees. BAC, which is headquartered in Rockford, comprises several counties in northern Illinois.

¶ 4    Plaintiff's four-count amended complaint brought one negligence count each against BSA and BAC. The injuries at the heart of the lawsuit were Bickerstaff's sexual assaults of John in July 2006 and the following months. (Criminal charges were brought against Bickerstaff in connection with the assaults, and he is now serving an 80-year prison term.) Although the complaint did not so indicate, Bickerstaff was retired from his position with BAC when the assaults occurred.

¶ 5    Plaintiff's complaint alleged as follows. John met Bickerstaff when John was a scout with BAC and Bickerstaff was "a paid executive of [BAC]" and also an agent or apparent agent of BSA. Bickerstaff was a "pedophile" who "posed a constant threat to boys." Both BSA and

BAC made representations to potential scouts and their parents that scouting is a wholesome and safe activity. Both entities, however, were aware that pedophiles had in the past infiltrated the leadership ranks of scouting. There were "warnings signs" prior to the summer of 2006 that Bickerstaff was a pedophile, but both entities ignored them. Exploiting his leadership roles in BSA and BAC, Bickerstaff "sought and gained [John's] trust, friendship, admiration, and obedience," and, consequently, John "was conditioned to comply with Bickerstaff's direction and to look to him as an authority figure." Bickerstaff also

> "sought and gained the trust and confidence of [plaintiff] and gained [her] consent for [John] to attend a BSA memorabilia Trade-O-Ree in Lansing, Michigan, and thereafter on several occasions, over the next 9 to 10 months, to spend time alone with Bickerstaff at Bickerstaff's home and at other locations."

¶ 6    Bickerstaff, both using "the power, authority, and trust of his positions" and "availing himself of [BSA's and BAC's] representations to parents and scouts that the BSA is a moral and safe place for boys, *** enticed, induced, directed, coerced, and forced [John] to engage in deviant sexual acts with [Bickerstaff] over a 9 to 10 month period."

¶ 7    Plaintiff alleged that BSA and BAC were "negligent in the manner that [they] screened, hired, retained, and supervised Bickerstaff when [they] knew or should have known that Bickerstaff posed a threat of sexual abuse to children." Plaintiff also made the broader allegation that BSA and BAC "[f]ailed to conduct background checks on new or existing scouting leaders, employees, agents, volunteers, agents and/or apparent agents or more carefully screen scout leaders who did not then and never had sons in Scouting."

¶ 8    BSA and BAC separately moved for summary judgment. Plaintiff filed a combined response to their motions, and BSA and BAC filed replies in support of their motions. The parties filed numerous attachments, including multiple depositions, from which we derive the following statement of facts.

¶ 9    Over his decades of work in scouting, Bickerstaff held the position of district executive or senior district executive at several local councils. A district executive is assigned to a particular district within a local council. The role of the district executive is to recruit and work with volunteers to raise funds, form scout units (or "packs"), and recruit scouts. A senior district executive has similar responsibilities but also has oversight of other district executives. All district executives within a council are responsible ultimately to the scout executive, the highest position in the council. District executives do not report to BSA.

¶ 10    In 1973, Bickerstaff became a district executive with the Twin Valley Council. In 1975, he left that position and joined the United States Navy as an officer. According to Bickerstaff, he underwent a background check by the Federal Bureau of Investigation as a condition of joining the Navy. In 1978, Bickerstaff received an honorable discharge from the Navy. The record contains an "Office Separation Questionnaire" completed by Bickerstaff, in which he indicated that he was asked to resign on suspicion of " 'homosexual tendencies' " and possession and sale of drugs. In 1978, Bickerstaff became a district executive with the Heart of America Council. Bickerstaff received a promotion in 1985 and was installed as senior district executive with the Coronado Area Council.

¶ 11    In 1989, Bickerstaff accepted overseas work and became a district executive for the Transatlantic Council (TC), where he was officed in Germany. The process by which Bickerstaff's credentials were reviewed by TC was consistent with the councils' hiring practices with respect to experienced council executives. According to the deposition testimony of numerous council executives, a council with a need for an executive will advertise the position and also notify BSA. BSA assists councils in finding candidates; one council executive described BSA as a "clearinghouse" for information on candidates for council positions. Another council executive described BSA as a "broker of human resources to other councils." When a candidate with no prior council-executive experience applies to a council and is turned down, the candidate's application information is forwarded to BSA, which will then distribute it as requested to other councils. BSA also receives and distributes information on candidates who have prior experience as council executives and are seeking reemployment in that position. When a council requests names of such experienced candidates, BSA forwards candidates' resumes, "career summar[ies]" of past employment with councils, and performance reviews from those councils. Typically, the performance reviews will cover only the one or two most recent years of scouting employment. An information packet forwarded by BSA does not purport to comprise the entirety of the candidate's employment file, but the scout executive of the hiring council can request the remainder of the file. In conjunction with reviewing this partial employment information, the hiring scout executive will ordinarily contact the scout executive(s) under whom the candidate had worked. The hiring scout executive also has discretion to contact non-scout employers, but typically does not. The hiring scout executive may also conduct a background check, but ordinarily relies on the background check that would have been done by BSA when the candidate was first hired as an executive. While it is clear from the record that candidates who are currently, or were most recently, employed as council executives receive this streamlined review, it is unclear whether the policy extends further to anyone previously employed by a council, no matter how remotely in time.

¶ 12    The record shows that BSA maintains an "ineligible volunteer list" (IV list) consisting of individuals deemed unfit for volunteer or paid positions within scouting. When a council approves an individual for a paid position, the paperwork is sent to BSA, which, in addition to performing a background check, references the candidate's name against the IV list. BSA has authority to reject any candidate who appears on the IV list. The record is unclear whether BSA has any further veto power over a council's hiring decision.

¶ 13    When Bickerstaff applied to TC, the scout executive, Robert Zadina, did not request any information on why Bickerstaff was discharged from the Navy. Zadina did not contact any councils where Bickerstaff had previously worked. Rather, Zadina based his decision entirely on his interview with Bickerstaff and Bickerstaff's resume and performance reviews from other councils. Zadina testified that this was usually the extent of his review of a candidate with council-executive experience. He explained: "I just know that they, the executives, are in good standing."

¶ 14    During his tenure with TC in Germany, Bickerstaff was involved in a car accident and was charged with and convicted of driving while intoxicated (DWI). His passenger at the

time of the accident was an 18-year-old male German national. Zadina did not terminate Bickerstaff and did not discipline him aside from having his driving privileges suspended as required under military law. Zadina did not record the DWI in Bickerstaff's employment file, because it occurred on his own time and no scouting personnel were involved. Also, Zadina did not report Bickerstaff to BSA for inclusion on the IV list.

¶ 15 In 1993, Bickerstaff's position with TC was eliminated because of a reduction in military personnel in Germany. Bickerstaff notified BSA of his interest in employment with other councils, and BSA accordingly distributed his application packet to councils, including BAC. While Bickerstaff was waiting for placement with another council, he obtained employment as a substitute teacher and with a temporary employment agency. In 1995, George Stone, scout executive for BAC, reviewed the materials on Bickerstaff that were provided by BSA. In his deposition testimony, Stone described Bickerstaff as "in transition," *i.e.*, his scouting position was eliminated and he was seeking reemployment. In keeping with custom, Stone received from BSA only Bickerstaff's resume, a summary of his employment history with councils, and his most recent performance reviews. According to Stone, review of a candidate in transition "depends on the circumstances, how long they're in transition and where they came from." The length of in-transition status might impact whether "any of the people [the candidate] worked for were still there." Stone's custom was to rely on the input of the scout executive(s) for whom the candidate had worked. Stone could not recall specifically with whom he spoke about Bickerstaff, but Stone knew for certain that he did not make any calls to TC about Bickerstaff.

¶ 16 Stone testified that he saw no indication in the materials he received that Bickerstaff was convicted of DWI in Germany. Stone would like to have known of the DWI in deciding whether to hire Bickerstaff. Stone acknowledged that he could have asked BSA for Bickerstaff's entire employment file, but did not. Stone testified that he interviewed Bickerstaff in conjunction with reviewing the materials from BSA. Also, after the interview, Stone asked fellow personnel at BAC whether they believed that Bickerstaff was a match. Stone took this extra step because Bickerstaff was being considered for the position of senior district executive. In 1995, Stone hired Bickerstaff for that position. Bickerstaff was assigned to the White Eagle District and was officed in Dixon.

¶ 17 Several months after Bickerstaff was hired, Stone was succeeded as scout executive by Alan Anderson, who eventually demoted Bickerstaff from senior district executive to district executive for failure to meet his fundraising and membership goals. According to Anderson, the only complaint he received from volunteers or parents about Bickerstaff was that he could be "a little cranky and flippant." Anderson had no other concerns about Bickerstaff's job performance.

¶ 18 Anderson was succeeded in 2003 by Donald Kinney, who was still scout executive in 2006 when Bickerstaff retired. Kinney testified that he never detected anything in Bickerstaff to suggest that he was unfit for a scouting position. On January 2, 2006, Bickerstaff gave BAC notice of his retirement. His final day of work was March 10, 2006.

¶ 19 Christian Long was the assistant scout executive at BAC, and Bickerstaff's immediate supervisor, during part of Bickerstaff's tenure. After Bickerstaff was arrested for assaulting

John, Long "wracked his brain" for warning signs that he might have observed in Bickerstaff. Long could recall no reason to suspect that Bickerstaff was a danger to children. Long did recall that Bickerstaff frequently took photographs at scout events. Photography was not part of Bickerstaff's duties as district executive, and Long was unsure why Bickerstaff enjoyed taking the photos.

¶ 20      Stephen Clark, a volunteer with BAC, testified to his suspicions about Bickerstaff. According to Clark, he and Bickerstaff attended the same church, where Bickerstaff was involved in the youth program. Clark became concerned that Bickerstaff was showing "an inordinate amount of interest" in young boys at church. Clark observed that Bickerstaff would "hug the kids, and pick them up, if they were small enough, and rub up against them." Clark also testified that Bickerstaff acted suspiciously at the YMCA where Clark's sons Patrick and Christian (born 1989 and 1987, respectively) were part of a swim team. Patrick reported to Clark that Bickerstaff would position himself in the locker room so that he could "watch," in one of the mirrors, Patrick and the other boys change clothes. Clark believed, but was not sure, that Patrick reported this in 2003 or 2004. Clark surmised that it was because of the flexibility of Bickerstaff's job that he was able to be at the YMCA on afternoons when the boys' swim team was practicing. Subsequent to Patrick's report, Clark noticed Bickerstaff watching Clark as he was changing in the locker room.

¶ 21      According to Clark, Bickerstaff displayed all of the "warning signs" of which scout volunteers are admonished as part of their training. According to Clark, who was himself a scout trainer, volunteers are given "the name of the scout executive and his direct phone number so that if you ever saw anything that was inappropriate that was going on, you were supposed to call directly to him." The scouting professionals who were deposed confirmed that BSA offers "youth protection materials" for councils to use at their option. BAC requires its volunteers and employees to review these materials, which describe abusive and potentially abusive behaviors. BAC requires its executives to be vigilant for warning signs and to immediately remove any volunteer or employee who appears to pose a danger to children. Another aspect of youth protection is "two-deep" leadership, which Anderson described as the "policy whereby all scouting functions that involve kids, scouts, needs [*sic*] a minimum of two adult leaders."

¶ 22      Clark testified that he did not contact the scout executive with his concerns about Bickerstaff because he did not have a "smoking gun," proof that Bickerstaff was molesting boys. Clark observed that Bickerstaff was more discreet during scouting and did not behave in the suspicious way Clark observed at church and the YMCA. Clark found it odd, however, that Bickerstaff attended so many scout functions. Clark indicated that the "closest" he came to sharing his suspicions about Bickerstaff with BAC personnel was telling Jon Geraghty, a paid BAC employee who maintained Camp Lowden. Clark told Geraghty that Bickerstaff was "weird around kids" and described to him Bickerstaff's behavior at the YMCA. Clark also shared his suspicions with several BAC volunteers, including Sharon Fannucci, a member of the district committee. Clark hoped that Fannucci would mention Clark's concerns to the paid district staff with whom she regularly met.

¶ 23    Geraghty testified that he was the ranger for Camp Lowden from 1991 to 2000. Geraghty estimated that he saw Bickerstaff at the camp about 10 times a year. Geraghty never noticed anything suspicious or strange about Bickerstaff. Geraghty could not recall being told by Clark that Bickerstaff had acted suspiciously around children.

¶ 24    Plaintiff and John testified to their contact with Bickerstaff. John first met Bickerstaff at a Boy Scout event in 2001 when John was 10 or 11 years old. Plaintiff understood that Bickerstaff was the district executive "who would oversee these major events." According to plaintiff, she and John saw Bickerstaff at all major scouting events over subsequent years and conversed with him on several of these occasions. In 2006, Bickerstaff approached plaintiff and John at one such event and suggested that John would be a good candidate for a foreign exchange program through the Rotary Club. Bickerstaff offered to recommend John for the program. Several times, Bickerstaff stopped by plaintiff's home to speak with her and John about the program and to introduce John to some foreign exchange students. John applied to the program, but learned in January or February 2006 that his application was denied. Subsequently, plaintiff asked Bickerstaff whether he would be willing to pay for modeling school for John. Bickerstaff agreed, but ultimately plaintiff decided against the schooling.

¶ 25    In June or July 2006, Bickerstaff phoned plaintiff and suggested that John accompany him to a convention in Lansing, Michigan, called a Trade-O-Ree. Bickerstaff described the Trade-O-Ree as a "flea market." Plaintiff understood that John and Bickerstaff would be traveling alone together. Plaintiff assumed that the event was scout-sanctioned but admitted that, if it were so sanctioned, Bickerstaff would be in violation of the two-deep leadership policy if he traveled alone with John. (There is no dispute that the Trade-O-Ree was not, in fact, sanctioned by BSA or any local council.) Plaintiff testified that she gave Bickerstaff permission to take John to the event, because Bickerstaff had been in scouting for several decades and she had known him for several years. Plaintiff had no suspicions about Bickerstaff and trusted him. Plaintiff noted that, before the Michigan trip, John had never been with Bickerstaff when other adults were not present.

¶ 26    Regarding the Michigan trip, John understood that he and Bickerstaff would be sleeping alone in a hotel room. John trusted Bickerstaff "because he was a scout leader." John assumed that Bickerstaff was still employed by BSA or BAC when they went to Michigan. During the trip, Bickerstaff sexually assaulted John. Bickerstaff also assaulted John on several later occasions, including an occasion when John came to Bickerstaff's house at his request to help him clean his gutters.

¶ 27    In their motions for summary judgment, BSA and BAC each denied that it had any duty to protect John when the sexual assaults occurred, as they began in July 2006. First, BSA asserted that Bickerstaff was employed by BAC, not BSA, during his scouting contact with John and, moreover, that Bickerstaff was no longer employed by any scouting organization when he sexually assaulted John. Second, BAC acknowledged that Bickerstaff had been its employee, but noted that Bickerstaff's final day of work with BAC–March 10, 2006–preceded by several months the initial sexual assault of John.

¶ 28    In her response, plaintiff argued that there was a material issue of fact on whether BSA and BAC negligently hired and retained Bickerstaff. Plaintiff also proposed other sources for

- 7 -

a duty of care by BSA and BAC. First, plaintiff argued that a duty arose because BSA and BAC voluntarily undertook to protect scouts from dangerous individuals such as pedophiles. Second, plaintiff argued that BAC assumed a duty by taking custody of John and so depriving him of his normal opportunities for protection.

¶ 29    The trial court determined that there was no material fact question on negligence and that BSA and BAC were entitled to judgment as a matter of law. First, the court held that neither BSA nor BAC could have committed the torts of negligent hiring and retention with respect to Bickerstaff, because, first, BSA never had employed him and, second, BAC no longer employed him when he inflicted the injuries for which plaintiff sought relief. Second, the court determined that BSA and BAC adequately executed all voluntary protective measures that they undertook. The court did not address plaintiff's claim that BAC failed to protect John once it took custody of him. The court granted summary judgment in favor of BSA and BAC on the two negligence counts against them.

¶ 30    The trial court also addressed a dispute between the parties as to the admissibility of handwritten journals that plaintiff, claiming the journals were composed by Bickerstaff, submitted during the summary judgment proceedings as evidence that Bickerstaff was a pedophile acting out his urges by sexually assaulting children. The parties disagreed over whether the journals were authenticated. The court found it necessary to resolve the authentication question because evidence inadmissible at trial may not be considered in a summary judgment proceeding. See *Harris Bank Hinsdale, N.A. v. Caliendo*, 235 Ill. App. 3d 1013, 1025 (1992) ("Although the court at the summary judgment stage does not try the issues [citations], evidence that would be inadmissible at trial may not be considered in support of or in opposition to a motion for summary judgment."). Applying Illinois Rule of Evidence 901 (eff. Jan. 1, 2011), the court held that the journals were not authenticated and, hence, could not be considered for purposes of summary judgment.

¶ 31    Plaintiff filed this timely appeal.


¶ 32                                    II. ANALYSIS
¶ 33            A. Principles Governing Review of Summary Judgment Rulings
¶ 34    The purpose of summary judgment is to determine whether a genuine issue of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Id.* at 43; 735 ILCS 5/2-1005(c) (West 2012). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the nonmovant. *Adams*, 211 Ill. 2d at 43. Since summary judgment is a drastic remedy, it should be granted only when the right of the movant is clear and free from doubt. *Id.* Review of a trial court's grant of summary judgment is *de novo*. *Id.*

¶ 35                                    B. Plaintiff's Theories of Negligence

¶ 36        Plaintiff's theories of liability all sound in negligence. " 'Unless a duty is owed, there is no negligence.' " *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 388 (1998) (quoting *American National Bank & Trust Co. of Chicago v. National Advertising Co.*, 149 Ill. 2d 14, 26 (1992)). Plaintiff bears the burden of establishing that BSA and BAC owed John a duty of care. See *Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110, 116 (1995). Plaintiff does not contend that either BSA or BAC had an ongoing duty in July 2006 to protect John from harm. Absent a special relationship, there is no duty to protect another from the criminal act of a third party (*Simmons v. Homatas*, 236 Ill. 2d 459, 475 (2010)), and plaintiff identifies no special relationship that existed between John and BSA or BAC at the time John was injured. This by itself is fatal to plaintiff's cause of action.

¶ 37        Nonetheless, we consider whether a duty that BSA or BAC might have owed to John prior to July 2006 could have remained in force at the time of the injuries. We find no such ground for liability in any of the three negligence theories that plaintiff proposes: negligent hiring and retention, voluntary undertaking of protection, and voluntary assumption of custody.


¶ 38                                    1. Negligent Hiring and Retention

¶ 39        "Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons." *Van Horne v. Muller*, 185 Ill. 2d 299, 310 (1998). "An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Id.* at 311.

¶ 40        There is no indication in the record that any employment relationship existed between BSA and Bickerstaff. In fact, the scouting professionals who were queried on the matter unequivocally maintained that Bickerstaff was employed by BAC, not BSA. Plaintiff claims, however, that BSA was "inextricably intertwined" with BAC in the process leading to Bickerstaff's hiring, as BSA acted as "the clearinghouse for local councils" and had the "final say over any hire." Thus, according to plaintiff, BSA "effectively hired Bickerstaff." We disagree. We know of no "effective" employment relationship under Illinois law except that which is determined by the following factors: " 'the right to control the manner in which the work is performed; the right to discharge; the method of payment; whether taxes are deducted from the payment; the level of skill required to perform the work; and the furnishing of the necessary tools, materials, or equipment.' " *Doe v. Brouillette*, 389 Ill. App. 3d 595, 606 (2009) (quoting *Lang v. Silva*, 306 Ill. App. 3d 960, 972 (1999)). "While no one single factor is considered determinative, the right to control the work is considered to be the predominant factor." *Id.* Plaintiff does not discuss these factors, and it is apparent that the most significant factor, namely, the right to control the work, weighs against finding an

employment relationship between BSA and Bickerstaff. Bickerstaff reported to BAC, not BSA. Therefore, we hold that, as a matter of law, BSA was not Bickerstaff's employer for purposes of the tort of negligent hiring and retention.[1]

¶ 41    While BAC was indeed Bickerstaff's employer, the injuries to John occurred after Bickerstaff voluntarily terminated his employment with BAC. Plaintiff has cited no authority, Illinois or otherwise, for holding an employer liable, under the tort of negligent hiring and retention, for an employee's posttermination acts. Our own research has disclosed no Illinois decision where a negligent-hiring-and-retention claim was based on posttermination acts. Our cursory research outside Illinois shows that the issue is controversial enough to have generated a split of authority. Compare *Abrams v. Worthington*, 169 Ohio App. 3d 94, 2006-Ohio-5516, 861 N.E.2d 920, at ¶ 16 (no liability, because employment relationship had terminated before the wrongful act occurred), with *Marquay v. Eno*, 662 A.2d 272, 280 (N.H. 1995) ("The requirement of causal connection to employment does not mean, however, that the employee's criminal conduct must have been performed within the scope of employment, during working hours, or even while the perpetrator was an employee."). Without considering the issue deeply, we can appreciate why courts would deem the termination of employment a logical and practical boundary for employer liability. Plaintiff suggests that "public policy *** dictates" that "liability should extend beyond the temporal bounds of the employment relationship." We think it unadvisable to weigh the wisdom of such a policy where plaintiff marshals not even one source of authority to her cause and fails to recognize the controversy in other jurisdictions.

¶ 42    Though we decline to make a definitive statement today, we note that the law of negligent hiring and retention in this state appears to afford little scope for liability for posttermination acts of employees. We consider first the following representative statement of the tort: "Liability for negligent hiring arises only when a particular unfitness of an applicant creates a danger of harm to a third person which the employer knew, or should have known, when he hired and placed this applicant *in employment where he could injure others*." (Emphasis added.) *Fallon v. Indian Trail School, Addison Township School District No. 4*, 148 Ill. App. 3d 931, 935 (1986). This language suggests that the purpose of the tort is to prevent injuries that occur during the term of employment and, consequently, suggests that the employer's duty of care does not extend beyond the cessation of employment.

¶ 43    Significant also is the rigorous standard of proximate causation applied in negligent-hiring-and-retention cases. Illinois courts require that the *injury itself* must have "occurred by virtue of the servant's employment (*i.e.*, 'because of the employment')." (Internal quotation marks omitted.) *Carter v. Skokie Detective Agency, Ltd.*, 256 Ill. App. 3d 77, 80 (1993). Though Illinois courts are careful to maintain that an employer may be liable "even though the employee commits the criminal or intentional act outside the scope of employment" (internal quotation marks omitted) (*id.*), liability for out-of-the-scope acts will

---

[1]Plaintiff appeared to concede the issue at oral argument, but as the concession was not unequivocal we include this discussion.

rest only where "the employee is on the employer's premises or using the chattel of the employer, and the employer has reason to know of the need and opportunity for exercising control over the employee" (*MacDonald v. Hinton*, 361 Ill. App. 3d 378, 387 (2005)). *MacDonald* relied on *Escobar v. Madsen Construction Co.*, 226 Ill. App. 3d 92, 95 (1992), which in turn relied on the Restatement (Second) of Torts, section 317 (1965). Courts have applied this rule to find liability lacking as a matter of law where, though the plaintiff came to know the employee only through the employment, the injury neither occurred on the employer's premises nor involved the instrumentalities of employment. See *MacDonald*, 361 Ill. App. 3d at 388 ("Plaintiff alleged that Maust killed James outside the scope of their employment at Trophies Are Us, but failed to allege that Maust killed James on defendant's premises or with the instrumentalities of the employment."); *Escobar*, 226 Ill. App. 3d at 95 (when the employee shot his coworker, the shooter "was not on [the employer's] jobsite, not doing [the employer's] work, and not using [the employer's] gun"). In such a case, the employment only "provided a condition for [the] attack" (by introducing the employee to the victim) and did not "proximately cause[ ]" it. *Escobar*, 226 Ill. App. 3d at 95. We do not opine on the wisdom of this approach, but note only that the policy exists and presents a formidable obstacle that plaintiff does not begin to address. Under this strict concept of causation, if the injury occurs–as here–after the actor's employment has ended, then *a fortiori* the injury cannot be connected to that employment.

¶ 44   Even if we disregarded these authorities and assumed *arguendo* that Illinois law extends the tort of negligent hiring and retention to postemployment actions, plaintiff has not persuaded us that any material fact question exists. First, on the issue of the hiring of Bickerstaff, the only information that plaintiff claims BAC would have uncovered had it fulfilled its duty to carefully screen applicants was (1) Bickerstaff's discharge from the Navy for suspected homosexuality and drug activity and (2) his DWI in Germany. In her briefs, plaintiff does not articulate how such facts would have made it reasonably foreseeable to BAC that Bickerstaff would sexually molest young boys. Rather, plaintiff merely insinuates that the presence of a "young man" in the car with Bickerstaff when he was arrested for DWI indicated some sexual impropriety. The "young man" was, in fact, 18 years old. Plaintiff's insinuation is simply unwarranted.

¶ 45   At oral argument, we pressed plaintiff to explain how these particular aspects of Bickerstaff's past made it reasonably foreseeable that he would molest young boys. Citing an unpublished decision from this court, plaintiff contended that drug use or possession constitutes a "crime of moral turpitude" that might well indicate a potential for physical assault as well. Plaintiff rightly acknowledged, however, that unpublished decisions are not precedential. See Ill. S. Ct. R. 23(e) (eff. July 1, 2011). Plaintiff also conceded that neither homosexuality nor DWI is a "crime of moral turpitude." For these reasons, we hold that plaintiff has identified no issue of material fact on whether BAC negligently hired Bickerstaff.

¶ 46   On the issue of *retention*, plaintiff contends that the negligence consisted of BAC's inaction after Clark informed Geraghty of how Bickerstaff behaved in the locker room at the YMCA. For purposes of this issue, BAC does not dispute that notice to Geraghty, a paid

- 11 -

employee of BAC, was effectively notice to BAC. Plaintiff, noting that John met Bickerstaff in 2001, argues that if BAC had immediately terminated Bickerstaff's employment when it learned of Clark's report through Geraghty–which, at the latest, would have been in 2000, the last year of Geraghty's employment with BAC–Bickerstaff would not have met John through scouting.

¶ 47   We cannot agree with plaintiff that Clark's testimony about his report to Geraghty raises a question of material fact that BAC negligently retained Bickerstaff. We note first that plaintiff was asked at oral argument to address what significance Clark's allegations had under the Abused and Neglected Child Reporting Act (Act) (325 ILCS 5/1 *et seq.* (West 2000)). Plaintiff agreed that BAC personnel qualified as mandatory reporters under section 4 of the Act, and hence were obligated to make an immediate report to the Department of Children and Family Services (DCFS) whenever they had "reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child" (325 ILCS 5/4 (West 2000)).[2] Plaintiff then conceded that BAC had no duty to report to DCFS what Clark told Geraghty about Bickerstaff. Plaintiff asserted, rather, that the Act was not the extent of BAC's duty under the law. Plaintiff claimed that BAC's responsibility to protect the youth in its charge required that it take measures *before* its statutory duty to report was triggered by an actual incident of abuse or neglect. According to plaintiff, Bickerstaff manifested in his behavior at the YMCA a "sexual attraction to young boys and *** predatory tendencies." Firing Bickerstaff immediately upon receiving Clark's report would have been, plaintiff contends, an appropriate and necessary precautionary act.

¶ 48   We cannot agree. Understandably, BAC was deeply concerned with ferreting out the potential for abuse before it manifested itself in harmful acts. At the same time, however, BAC had to deal justly with its employees and not take lightly the decision to terminate. Even in view of BAC's appropriately heightened sensitivity to danger, Bickerstaff's conduct at the YMCA was not so clearly prurient, and did not signal such an immediate danger to scouts, as to warrant depriving him of any opportunity to explain himself. Such an explanation might have reasonably persuaded BAC that Bickerstaff's actions were wrongly perceived.

¶ 49   Plaintiff likens this case to *Doe v. Dimovski*, 336 Ill. App. 3d 292 (2003), where this court found the plaintiff's complaint alleging negligent retention sufficient to survive a motion to dismiss. The plaintiff alleged that the following conduct by the school district's employee, Steven Dimovski, placed the district on notice of Dimovski's dangerous proclivities:

> "Dimovski engaged in a course of inappropriate sexual harassment and abuse and made inappropriate sexual advances and statements to a female student under the age of 18 at Westmont [High School], including expressing his desire to see the student naked, requesting that she perform a strip tease for him, and following her to her place of work and her residence, where the sexual harassment, advances, innuendo, and suggestion continued." *Id.* at 294.

---

[2]Abuse occurs, *inter alia*, when a sex offense is committed or allowed to be committed against the child. 325 ILCS 5/3(c) (West 2000).

¶ 50    The alleged conduct in *Dimovski* consisted of what appeared to be unequivocally salacious overtures, far unlike the "watching" in this case (as it was described by Clark), which could have had an innocent explanation.

¶ 51    To summarize, we affirm the summary judgment on alternative bases. First, plaintiff alleges liability under the tort of negligent retention and hiring for the posttermination acts of an employee, yet cites no authority, Illinois or otherwise, for imposing liability for acts beyond the term of employment. Our brief research suggests that what plaintiff seeks is a broadening of liability as currently recognized by Illinois law, and we note that foreign jurisdictions are split on the issue of whether to extend liability beyond the termination of employment. Second, even if we were to recognize such an extension of liability for negligent hiring and retention, plaintiff fails to identify an issue of material fact that would preclude summary judgment in BAC's favor.

¶ 52                        2. Voluntary Undertaking

¶ 53    "Generally, pursuant to the voluntary undertaking theory of liability, 'one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking.' " *Wakulich v. Mraz*, 203 Ill. 2d 223, 241 (2003) (quoting *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 239 (1996)). "The theory is narrowly construed." *Bell v. Hutsell*, 2011 IL 110724, ¶ 12. Moreover, "the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Id.*

¶ 54    Plaintiff argues that BSA and BAC undertook to protect youth from sexual predators and failed in that duty in two respects. First, Bickerstaff was hired by BAC despite dubious facts in his background, specifically his discharge from the Navy for suspected homosexual tendencies and drug activity, and his DWI in Germany while district executive for TC. Second, Bickerstaff was retained despite Clark's report to Geraghty that defendant showed a prurient interest in boys.

¶ 55    Even if we agreed in general terms that BSA and BAC undertook to protect John against the likes of Bickerstaff, we would still hold as a matter of law that neither defendant is liable for John's injuries. Plaintiff fails to recognize that "[a] person who has gratuitously assumed to protect others against injury is under no obligation to continue that protection indefinitely." *Sumner v. Hebenstreit*, 167 Ill. App. 3d 881, 887 (1988). We see no indication in the record that BSA and BAC intended to continue their protection of John after Bickerstaff's employment was terminated. We recognize that one who voluntarily undertakes to protect another must terminate that undertaking without " 'put[ting] the other in a worse position than he was in before the actor attempted to aid him.' " *Bell*, 2011 IL 110724, ¶ 24 (quoting Restatement (Second) of Torts § 323 cmt. c (1965)). But plaintiff identifies no way in which John was placed in a worse position by the cessation of whatever voluntary protective measures BSA or BAC had undertaken. We note that, even if John came to trust Bickerstaff by virtue of his long-standing leadership position in scouting, BSA and BAC never condoned John, or any youth, taking a weekend trip alone with an adult scout leader, and in fact the organizations' two-deep leadership policy prohibited such an arrangement.

### 3. Voluntary Custody

Finally, plaintiff claims that a duty of care arose when BAC took John into its custody. (Plaintiff makes no such claim regarding BSA.) "[A] special relationship creating a duty to aid or protect exists when one 'voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection.' " *Wells v. Endicott*, 2013 IL App (5th) 110570, ¶ 48 (quoting Restatement (Second) of Torts § 314A(4) (1965)). As with the other theories of negligence discussed above, the claim of voluntary custody fails as a matter of law because there is no indication that the relationship that would have entailed a duty of care was still in existence when the injuries occurred. Bickerstaff was no longer employed by BAC in July 2006 when the assaults began, and plaintiff alleges no other way in which John could have been in the custody of BAC when the assaults occurred.

Our opinion would not change even if we were to recognize that BAC could, in theory, be held responsible for certain antecedent acts occurring while Bickerstaff and John were both in scouting–for instance, acts of "grooming" by Bickerstaff. Plaintiff points to no occasion during John's scouting career when he was placed in a situation depriving him of normal opportunities for protection and leaving him vulnerable to Bickerstaff's manipulation. In particular, the record reveals no point during John's scouting experiences when he was alone with Bickerstaff. The two-deep leadership policy appears to have been honored in John's scouting contact with Bickerstaff. John was brought into contact with Bickerstaff through scouting, but BAC's policies never encouraged a youth to trust an adult scout leader to the extent of traveling alone with him.

### C. Admissibility of the Journals

Plaintiff argues that the trial court erred in finding that the handwritten journals were not authenticated and, hence, could not be considered in the summary judgment proceedings. We do not decide this issue, as plaintiff fails to articulate how the journals are relevant to the substance of her lawsuit. First, while plaintiff claims that the journals document Bickerstaff's sexual abuse of children, she describes no specific content of the journals but simply provides a string of record citations, on the apparent assumption that we will review those pages to determine what precisely she has in view. We will not carry plaintiff's burden of argumentation. We are entitled to a statement of facts "necessary to an understanding of the case" (Ill. S. Ct. R. 341(h)(6) (eff. Sept. 1, 2006)), which plaintiff has not provided on this particular issue.

Second, even if we overlooked this failure, plaintiff's argument suffers from a further fatal shortcoming, namely, she fails to demonstrate how the journals impact the overarching issue on appeal, which is not whether Bickerstaff was a pedophile (neither BSA nor BAC disputes that he was), but whether BSA or BAC had reason to know that he was. Plaintiff claims that the journals boost Clark's credibility, but in fact the journals would at best corroborate Clark's opinion that Bickerstaff was a potential danger to children, not his claim

that he provided BSA and BAC notice of that potential danger.[3] Thus, we find no error in the trial court's ruling on the journals.

¶ 62                                    III. CONCLUSION

¶ 63        For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County granting summary judgment in favor of BSA and BAC.

¶ 64        Affirmed.

---

[3]Plaintiff conceded at oral argument that the journals do not "matter as much" as Clark's report to Geraghty.