2018 IL App (2d) 170435
No. 2-17-0435
Opinion filed March 30, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JANE DOE, a Minor, by her Mother and Next Friend, Jane A. Doe, and by her Father and Next Friend, John Doe; JANE A. DOE; and JOHN DOE, | ) ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 15-L-216 |
| CHAD COE; THE FIRST CONGREGATIONAL CHURCH OF DUNDEE, ILLINOIS; and PASTOR AARON JAMES, | ) ) ) ) ) | |
| Defendants | ) ) | |
| (The First Congregational Church of Dundee, Illinois, and Pastor Aaron James, Defendants-Appellees). | ) ) ) | Honorable James R. Murphy, Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs, Jane Doe (Jane), Jane A. Doe, and John Doe, appeal the dismissal with prejudice of their second amended complaint against defendants, the First Congregational Church of Dundee, Illinois (FCCD), and its pastor, Aaron James. The complaint alleged that

Chad Coe sexually groomed and ultimately raped[1] Jane while Coe was employed as FCCD's director of youth ministries and Jane was a member of FCCD's youth group, which was overseen by Coe. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3                    A. Plaintiffs' Original and First Amended Complaints

¶ 4      Plaintiffs filed their initial complaint in August 2015. They named several defendants, including Coe, James, and FCCD. FCCD is a local congregation of the United Church of Christ (UCC) that employed James and Coe during the relevant period. Plaintiffs also named the UCC itself and various entities within its loosely hierarchical organization (collectively, the UCC defendants).

¶ 5      In January 2016, on the motion of FCCD and James, the trial court dismissed without prejudice the counts against them. Plaintiffs filed their first amended complaint in February 2016. They alleged four causes of action against both FCCD and James: negligent supervision, negligent retention, "willful and wanton failure to protect," and "willful and wanton retention and failure to supervise." Against FCCD, plaintiff additionally alleged negligent hiring. The core allegations of the complaint described a two-year period, from 2011 through 2013, in which

---

[1] The common-law crime of rape has been replaced with statutes defining the offenses of criminal sexual assault and aggravated criminal sexual assault. See *People v. Brown*, 2013 IL App (2d) 110303, ¶ 61. Nonetheless, in keeping with plaintiffs' terminology in their complaint, we will refer to Jane as (allegedly) having been "raped" by Coe.

Coe abused his position as FCCD's youth director through various forms of sexual misconduct toward female minors who were members of FCCD's youth and confirmation groups. A particular focus of the allegations was Jane, whom Coe subjected to persistent sexual advances before raping her in June 2013.

¶ 6    In the negligent-hiring count, plaintiffs alleged that, if FCCD had searched Coe's online activity prior to hiring him, it would have discovered that Coe maintained profiles on several websites that featured adult or child pornography. In the remaining counts, plaintiffs alleged that FCCD and James failed to properly supervise Coe. They also alleged that FCCD and James knew or should have known of Coe's misconduct prior to the rape of Jane.

¶ 7    James, FCCD, and the UCC defendants filed motions to dismiss plaintiff's first amended complaint, pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2014)). James and FCCD also moved the trial court to strike, as irrelevant or cumulative, certain paragraphs of the first amended complaint, in case the court denied the motions to dismiss or granted them with leave to refile. FCCD and James sought to have stricken, *inter alia*, paragraphs alleging how FCCD and James responded after Jane disclosed the rape and Coe was arrested for it.

¶ 8    The trial court agreed with FCCD and James that the counts against them failed to state a cause of action. As to the negligent-hiring count against FCCD, the court reasoned that an online search of Coe's name would not necessarily have disclosed his activity on pornographic websites, because, according to the complaint, he conducted that activity under a pseudonym. As to the remaining counts, the court found nothing in the complaint to indicate that either FCCD or James was or should have been aware of Coe's malfeasance prior to his sexual assault of Jane.

¶ 9        The court denied plaintiffs leave to replead any of the counts against James or the willful-and-wanton counts against FCCD.   First, the court reasoned that, if plaintiffs could not adequately plead simple negligence after two attempts, there was scant chance of their success on a subsequent attempt to plead willful and wanton conduct (which is an aggravated form of negligence (see *Doe-3 v. McLean County Unit District  No. 5 Board of Directors*, 2012 IL 112479, ¶ 19)).   Second, the court held that, while James's acts or omissions as an agent of FCCD might form the basis for FCCD's liability, James could not be held personally liable.

¶ 10        The court dismissed the negligence counts against FCCD without prejudice.   The court also granted in its entirety FCCD and James's motion to strike portions of the first amended complaint.

¶ 11        The court dismissed with prejudice the counts in the first amended complaint that were particular to the UCC defendants.   Subsequently, we reversed that dismissal and remanded for further proceedings.   See *Doe v. Coe*, 2017 IL App (2d) 160875.

¶ 12        Plaintiffs filed a motion to reconsider the dismissals of the counts against FCCD and James.   The court granted the motion only to the extent of permitting plaintiffs to replead the negligence counts against James.

¶ 13                              B. Plaintiffs' Second Amended Complaint

¶ 14                              1. Overview of Counts Against FCCD and James

¶ 15        In December 2016, plaintiffs filed their 70-page second amended complaint, which is the subject of this appeal.   Plaintiffs renewed their various claims against Coe and their claims against FCCD and James for negligence and willful and wanton conduct.   They pled 16 counts in total.  Counts I through VII named only Coe.  James alone was named in counts VIII (negligent supervision), IX (negligent retention), X (willful-and-wanton failure to protect), and XI (willful-

and-wanton retention and failure to supervise). FCCD alone was named in counts XII (negligent hiring), XIII (negligent supervision), XIV (negligent retention), XV (willful-and-wanton failure to protect), and XVI (willful-and-wanton retention and failure to supervise).

¶ 16    We organize the general and specific allegations under the following headings:

¶ 17                    2. The UCC, the IUCC, and the Safe Church Policy

¶ 18    Plaintiffs alleged that the UCC is "a religious organization composed of Local Churches, Associations, Conferences, and a General Synod organized in a hierarchical structure." The UCC has an entity called the Insurance Board, one purpose of which is to "assist in creating and maintaining safe church environments within the UCC organization, including, but not limited to, Local Churches." On August 21, 2006, the Insurance Board "sent a letter to the UCC and its sub-entities to provide expectations and recommendations regarding the adoption of written safe church abuse prevention policies at UCC Local Churches." The August 21 letter contained recommended " 'Internet Safety Guidelines' " (ISG). The ISG restricted adult-minor online interaction and barred "improper" or "offensive" online content. The letter also contained a sample policy on " 'Appropriate and Inappropriate Affection Between Staff and Children,' " which provided specific examples of such inappropriate contact.

¶ 19    Following the August 21 letter from the Insurance Board, the general counsel for the UCC (General Counsel) sent a letter to local churches within the UCC "regarding compliance with the Insurance Board's recommendations." The General Counsel included in the letter "a sample safe church policy that the General Counsel drafted pursuant to the Insurance Board's recommendation for a more comprehensive safe church policy for Local Churches." On November 18, 2006, the Illinois Conference of the United Church of Christ (IUCC) "approved

the 'Safe Church Policy-Abuse Prevention' policy" (SCP), which was based on the safe church policy provided by the General Counsel.

¶ 20    As FCCD is a local church within the IUCC, "[FCCD] employees and volunteers were required to read and follow the [SCP]" and "to sign a disclosure statement attesting to and acknowledging the [SCP]." The SCP required that (1) all employees and volunteers undergo a background check prior to working with minors, (2) "at least two adults be present to supervise any minor youth or child activities," and (3) "incidents of child abuse observed by employees or volunteers *** be reported to the Illinois Department of Children and Family Services[.]" The SCP also defined "sexual exploitation" and "sexual harassment."

¶ 21                                     3. FCCD's Hiring of Coe

¶ 22    Plaintiffs alleged that, when Coe was hired as youth director by FCCD, his father, Douglas Coe (Douglas), "held a senior position within the UCC as an Association Council Member of [the Fox Valley Association]" (FVA), which is an "Association" within the IUCC. In hiring Coe, FCCD relied on the recommendation of Douglas or the FVA and performed no further investigation into Coe's background or fitness for the position.

¶ 23    In their specific allegations within the negligent-hiring count (count XII) against FCCD, plaintiffs alleged that FCCD "failed to conduct even a basic, cursory Google search, or any investigation into the background and fitness of Coe for the position of Director of Youth Ministries in violation of church policy." They further alleged:

> "A basic, cursory Google search into the online public presence of Coe would have revealed Coe's activity, which included posting public photos of his own genitalia, on numerous websites, such as, 'newbienudes,' 'motherless,' 'wouldyouhitthis,' 'ratemybody,' 'ratemymelons,' and 'datehookup,' among many others."

¶ 24   In their general allegations—incorporated into the negligent-hiring count—plaintiffs elaborated on the nature of Coe's online presence:

"127. At all times relevant, Coe maintained public online profiles under his name and under the username 'BluesGod88' that could be found using a basic, cursory Google search.

128. At all times relevant, Coe commonly 'friended' employees, volunteers, and members of [FCCD], including members of the Youth Group[,] on social media sites.

129. At all times relevant, Coe commonly 'friended' employees, volunteers, and members of [FCCD], including members of the Youth Group, of [*sic*] social media sites on which he maintained profiles as 'BluesGod88.'

130. At all times relevant, Coe maintained profiles as 'BluesGod88' on numerous pornographic Adult Obscenity or Child Pornography Internet Sites.

\*\*\*

132. At all times relevant, Coe posted Obscene, pornographic images of himself, including his genitals and erect penis, on the internet using 'BluesGod88' profiles."

¶ 25   The complaint did not identify when FCCD hired Coe, but it alleged that his misconduct occurred from 2011 through 2013 and that FCCD fired him on November 12, 2013.  FCCD hired James in May 2009 as its senior pastor.  In that capacity, James was "the master and direct supervisor of Coe[.]"

¶ 26   Coe's responsibilities as FCCD's youth director "included, among other things, counseling of youth members and the planning and execution of all programming for the confirmation class, as well as the middle and high school youth ministries at [FCCD]."

¶ 27    Coe worked from an office inside FCCD's building.  His office was near other church administrative offices, such as James's office.  Coe and James typically were present together in the building on weekdays from 8 a.m. to 5 p.m. (normal working hours) and for church services and special events.

¶ 28                                4. Coe's Misconduct at FCCD

¶ 29                        a. General Misconduct Involving Female Minors

¶ 30    Plaintiffs devoted 28 pages of their complaint to an inventory of Coe's alleged misconduct at FCCD.  Some of the conduct is described in detail, but other descriptions are vague and make frequent use of the capitalized catchall term, "Inappropriate," which plaintiffs defined early in the complaint to encompass:

> "Inappropriate Content, Inappropriate Displays of Affection, Sexual Harassment and Sexual Exploitation, as defined by UCC policies and materials, as well as conduct or materials defined by Illinois law to be Grooming, Sex Offenses, Harmful to Minors, Obscene, Adult Obscenity or Child Pornography Internet Site."

¶ 31    Our recapitulation of the misconduct allegations is not exhaustive, and need not be.  In this appeal, Coe's conduct is relevant only as it impacts the potential liability of FCCD and James.  We are concerned particularly with alleged violations of the SCP by FCCD and James and with allegations suggesting that they were or should have been aware of Coe's unfitness for his position.

¶ 32    Some of Coe's misconduct at FCCD is not alleged to have directly impacted others in the church.  For instance, Coe is alleged to have used FCCD's computers to visit and maintain profiles on websites with adult and child pornography and to store pornographic pictures.

¶ 33   The remaining misconduct involves members of FCCD's youth and confirmation groups, which Coe oversaw as FCCD's youth director.  There are separate paragraphs in the complaint for misconduct involving Jane in particular and for misconduct that Coe directed toward multiple unnamed female minors who were members of the youth or confirmation groups at FCCD.  As for the latter, general misconduct, Coe is alleged to have used his cellular phone and FCCD's computers to (1) store pornographic images of underage female members of the youth group, (2) store pornographic images of himself and send them to underage female members, and (3) " 'friend' " underage female members on social media sites and "discuss [their] romantic relationship or sexual relationships," in violation of the ISG.

¶ 34   This general misconduct toward underage female members of the youth and confirmation groups  also allegedly included in-person misconduct.  Plaintiffs alleged the following misconduct by Coe, "commonly" or "habitually" with underage female members: (1) making inappropriate physical contact, (2) making sexually suggestive remarks and engaging the members in sexually-charged banter and games, and (3) showing the groups videos with "Inappropriate sexual content," including pornographic content.  Plaintiffs specifically described the types of touches, remarks, games, and movies that constituted Coe's misconduct.

¶ 35   Plaintiffs alleged no dates for the foregoing misconduct, except for an instance that occurred at a "Confirmation event" in 2011.  *Infra* ¶ 43.

¶ 36                         b. Misconduct Involving Jane

¶ 37   Plaintiffs alleged that Jane was the victim of a campaign of grooming by Coe that occurred from 2011 through 2013.  According to plaintiffs, the grooming "escalated" during the summer of 2012, when Jane was 14 years old and Coe was 30 years old.  Coe psychologically manipulated Jane to increase her trust and emotional dependence on him.  He "encouraged [Jane]

to spend large amounts of time telling Coe about intimate details of her life[.]" He "stressed to [her] the importance of and necessity for secrecy and cautioned her repeatedly against telling anyone about the 'relationship' between [them]."

¶ 38 Plaintiffs alleged that Coe used FCCD's computer equipment to communicate with Jane. Coe sent her sexually explicit pictures and videos, including some of himself. He also "gradually encourage[d] and convince[d] [Jane] to remove her clothing during 'games' of 'truth or dare.' " Coe accessed and viewed sexually explicit images of Jane.

¶ 39 In late 2012 and in 2013, Coe "began to make Inappropriate physical contact with Jane Doe, including kissing [her] and touching [her] in a sexual manner." Coe encouraged Jane to use the pretext of church activities to visit him at his office at FCCD during normal working hours. Coe "isolated [Jane] in areas of the church building, such as the downstairs classroom, the sacristy, and the audio-visual booth, where Coe kissed [Jane] and touched her in a sexual manner." During at least one occasion when Coe played a movie for the youth group, he sat with Jane in the back of the room and fondled her. Coe would also make sexual comments to Jane. For instance, he developed a pet name for her genitalia and used it "openly in front of other youths."

¶ 40 In June 2013, Coe convinced Jane to volunteer at FCCD's vacation bible school (VBS), a daytime summer program for elementary-age children. Coe presented it as a way for the two to be alone together. On June 14, 2013, Doe and Jane were alone together in a basement classroom of the church when he raped her on a couch. The assault occurred during normal working hours.

¶ 41                              c. Visibility of Coe's Misconduct

¶ 42 Plaintiffs alleged that Coe was the only adult present "[d]uring many of the times that [he] engaged in acts of sexual innuendo and suggestion and other forms of Inappropriate physical

and sexual conduct with Youth Group participants[.]" Coe was also the only adult present with the youth group when he showed them videos with sexual content. Coe was "habitually alone" on FCCD's premises with underage female members of the youth group. He would "habitually isolate[ ] minor female members of the Youth Group for 'private lessons' *** and would send away other Youth Group members who would attempt to watch or otherwise be present for the 'private lessons.' "

¶ 43     In what follows, we recite verbatim the allegations on which plaintiffs rely in this appeal for their position that FCCD and James knew or should have known of Coe's unfitness for his position as youth director, prior to the rape of Jane. Plaintiffs alleged:

"159. During the Confirmation event for the 2011 confirmation class at [FCCD], Coe allowed underage girls to sit on his lap and engaged in Inappropriate bodily contact (the '2011 Confirmation Incident').

* * *

177. On one occasion, Coe represented to Jane Doe that he was waiting for a colleague to come to Coe's office and retrieve Coe for an employee meeting. While he waited for the colleague to arrive and with the door to his office fully open to the adjacent offices, Coe sent Jane Doe a picture of his erect penis with the caption 'How's that?'

* * *

183. When Jane Doe visited Coe in his office during Normal Working Hours, Coe routinely kept his office door open.

* * *

187. When Jane Doe visited Coe in his office during Normal Working Hours and with his office door open, Coe routinely stroked her legs, breasts, buttocks, crotch, and kissed Jane Doe.

* * *

196. During an FCC overnight retreat in late 2012, Coe maintained a sleeping area in the same area as underage female Youth Group members and allowed the females in or on his sleeping bag. Coe stayed up late with Jane Doe, who was in or on his sleeping bag, while the rest of the participants slept. Later in the weekend, Coe isolated Jane Doe in one of the dormitory buildings and told her he wanted to put her on one of the dorm beds and 'have sex' with her, i.e., rape her.

* * *

239. Rev. James was present at [FCCD] during Normal Working Hours and at Youth Group and [FCCD] functions to witness Coe's interactions with youth.

240. Rev. James was present at [FCCD] during Normal Working Hours and at Youth Group and [FCCD] functions to witness Coe's Inappropriate interactions with Jane Doe.

241. Rev. James knew or had reason to know that Coe's behavior and interactions with youth, including Jane Doe, were Inappropriate.

242. Rev. James knew or had reason to know that Coe's behavior and interactions with youth, including Jane Doe, were dangerous.

243. Specifically, Rev. James knew or should have known the following:

[repeating the allegations of Coe's misconduct toward youth group members and the allegation concerning Coe's behavior at the 2011 confirmation event].

\* \* \*

261. [FCCD] employees, members, or volunteers were present at [FCCD] during Normal Working Hours and at Youth Group and [FCCD] functions to witness Coe's interactions with youth.

262. [FCCD] employees, members, or volunteers were present at [FCCD] during Normal Working Hours and at Youth Group and [FCCD] functions to witness Coe's Inappropriate interactions with Jane Doe.

263. [FCCD] knew or had reason to know that Coe's behavior and interactions with youth, including Jane Doe, were Inappropriate.

264. [FCCD] knew or had reason to know that Coe's behavior and interactions with youth, including Jane Doe, were dangerous.

265. [FCCD] knew or should have known the following:

[repeating the allegations of Coe's misconduct toward youth group members and the allegation concerning Coe's behavior at the 2011 confirmation event].

\* \* \*

272. [FCCD] employees, volunteers, or members were present at [FCCD] during Normal Working Hours and during church events to witness Coe's Inappropriate attentiveness, behavior, or physical contact with minor members of the Youth Group, including Jane Doe.

273. Multiple adult employees, volunteers, or members witnessed behavior on the part of Coe toward minor females in the youth group that those adults found unsettling and Inappropriate.

274. Multiple adult employees, volunteers, or members received information from the children of [FCCD] regarding Coe's Inappropriate behavior toward minor females in the Youth Group that the [*sic*] made the children feel uncomfortable, weird, isolated, or frustrated.

275. Multiple adult [FCCD] employees, volunteers, or members witnessed Coe alone in the sanctuary of the church with minor female members of the Youth Group.

276. Multiple adult [FCCD] employees, volunteers, or members witnessed Coe alone in his office with minor female members of the Youth Group.

277. [FCCD] employees, volunteers, or members reported or discussed among themselves the Inappropriate attentiveness, behavior, or physical contact by Coe with female members of the Youth Group witnessed by those employees or volunteers.

\*\*\*

279. [FCCD] employees, volunteers, or members were present at [FCCD] during Normal Working Hours and during church events to witness Coe's Inappropriate attentiveness, behavior, or physical contact with Jane Doe during late 2012 and 2013.

280. In March 2013, at least [one] employee of [FCCD] observed Coe alone in the audio-visual booth with Jane Doe with the lights out.

281. Multiple [FCCD] employees, volunteers, or members witnessed Coe's Inappropriate attentiveness, behavior, or physical contact with Jane Doe during late 2012 and 2013.

282. At least one [FCCD] employees, volunteers, or members [*sic*] confronted Coe regarding his Inappropriate behavior.

283. [FCCD] employees, volunteers, or members reported or discussed among themselves the Inappropriate attentiveness, behavior, or physical contact by Coe with Jane Doe witnessed during late 2012 and 2013.

* * *

286. Coe's Inappropriate attentiveness, behavior, or physical contact with Jane Doe was reported to Rev. James during late 2012 and 2013.

287. Coe's attentiveness, behavior, or physical contact with Jane Doe was witnessed by Rev. James during Normal Working Hours, and at Youth Group and/or [FCCD] events during late 2012 and 2013.

288. On at least three (3) separate occasions, Rev. James walked into Coe's office when Coe was alone with Jane Doe.

289. During each of the three (3) separate occasions in which Rev. James witnessed Coe alone with Jane Doe, Jane Doe was either lying on a sofa or sitting on Coe's desk.

* * *

297. In June 2013, an [FCCD] volunteer was present during normal business hours at [FCCD] for the purpose of assisting with the VBS program.

298. The [FCCD] volunteer assisting with the VBS program was an early childhood education professional and, therefore, a mandatory reporter separate and apart from her role at [FCCD] (the 'Volunteer').

299. Within less than two days of witnessing the interaction between Coe and Jane Doe at VBS, the Volunteer recognized the interaction as Inappropriate or dangerous.

300. The Volunteer placed a phone call to Rev. James before the rape occurred to report the Inappropriate conduct and reported the Inappropriate conduct to Rev. James in a subsequent meeting.

***

302. At no point after the Volunteer reported the Inappropriate conduct to Rev. James did James remove Coe as Director of Youth Ministries or otherwise restrict his access to minors, including Jane Doe."

¶ 44                           5. Violations of the SCP

¶ 45    As noted, plaintiffs alleged that Coe was the only adult present when he showed the youth group movies with sexual content. Plaintiffs further alleged that Coe was the only adult present "[d]uring many" of the times in which he "engaged in acts of sexual innuendo and suggestion and other forms of Inappropriate physical and sexual conduct" with youth group members. (Plaintiffs did not identify which other adults were present on the other occasions.) Plaintiffs also alleged that Coe was "habitually alone" in various parts of the church with underage female members of the youth group. Regarding Jane specifically, plaintiffs alleged that Coe would isolate her in various parts of the church and that on one of these occasions he raped her.

¶ 46    Plaintiffs alleged that FCCD and James "knew or should have known that Coe was routinely the only adult supervising minor youths at [FCCD]." On three separate occasions, James witnessed Coe alone with Jane in his office but did not enforce the two-adult policy. According to plaintiffs, other FCCD employees, volunteers, or members also witnessed Coe in

his office or in the church sanctuary alone with Jane or other underage female members of the youth group.

¶ 47                                    6. Events Subsequent to the Rape of Jane

¶ 48     Plaintiffs alleged that, in mid-June 2013, Jane shared with " 'Sally,' " a fellow member of the youth group, text messages that Coe had sent Jane. After Sally revealed the texts to her parents, her father went to Coe's office at FCCD and loudly confronted him. Afterward, Sally's parents removed her from an upcoming youth trip to Costa Rica that Coe was planning to lead. James allowed Coe to take the group to Costa Rica despite what James had been told by the VBS volunteer and despite his knowing or having reason to know of the confrontation between Sally's father and Coe. Between June 28 and July 1, 2013, Jane told Jane A. that Coe had raped her. Coe was arrested on July 3, 2013, and subsequently charged with sex crimes against Jane. Several months later, after a search of his work computer, he was charged with possession of child pornography.

¶ 49     Plaintiffs alleged that, on July 3, 2013, following Coe's arrest, James conducted an open meeting with FCCD's employees, members, and volunteers. At the meeting, FCCD members "questioned Rev. James regarding the lack of or ongoing failure of any safety plan, specifically citing the 2011 Confirmation Incident." James responded that FCCD currently had a safety plan, which could be viewed on the church's website. Plaintiffs alleged that, contrary to James's assertion at the meeting, there was no safety plan in place at FCCD as of July 3, 2013, and that, if there were such a plan in place, it had not been followed. At the July 3 meeting, James did not address any of Coe's misconduct but expressed gratitude that Coe and his family had strong support at FCCD.

¶ 50    On August 25, 2013, James held a meeting for the parents of youth group members. James "represented that a 'new' safety policy was in place that would require at least two adult supervisors in the presence of any child or minor youth." James encouraged members to be supportive of Coe but failed to inform them that the Illinois Department of Children and Family Services had made an indicated finding of child abuse at FCCD or that the court in Coe's criminal case had prohibited him from having unsupervised contact with children. FCCD terminated Coe's employment on November 12, 2013.

¶ 51                    C. FCCD and James's Motion to Dismiss

¶ 52    FCCD and James filed a joint motion, pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2014)), to dismiss plaintiffs' second amended complaint. The trial court agreed with them that the complaint did not cure the deficiencies that led to the dismissal of the first amended complaint. The court found that plaintiffs' allegations still lacked factual detail as to the misconduct of Coe that was observed, who observed it, and when it was observed. The court held that, because plaintiffs failed to establish that Coe's rape of Jane was reasonably foreseeable to FCCD and James, plaintiffs failed to establish that FCCD and James had a duty to prevent it. The court dismissed plaintiffs' complaint with prejudice. The court found, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that there was no just cause for delaying enforcement or appeal.

¶ 53    Plaintiffs filed this timely appeal. FCCD and James filed a joint appearance and a joint appellees' brief.

¶ 54                              II. ANALYSIS

¶ 55            A. Stricken Portions of the First Amended Complaint

¶ 56    Plaintiffs challenge the trial court's grant of FCCD and James's motion to strike portions of plaintiffs' first amended complaint as irrelevant or cumulative.  FCCD and James brought the motion pursuant to section 2-615(a) of the Code (735 ILCS 5/2-615(a) (West 2014)), which permits the trial court to strike "immaterial matter" from a complaint.  While the motion covered diverse portions of the complaint, and the court granted it in its entirety, plaintiffs' challenge on appeal is limited to the striking of allegations concerning events that occurred after Jane disclosed the alleged rape and Coe was arrested (curiously, the parties seem to have forgotten the breadth of the motion and rely on some allegations as if they were not stricken).  We review *de novo* the grant of a motion to strike pursuant to section 2-615(a).  *Department of Healthcare & Family Services ex rel. Daniels v. Beamon*, 2012 IL App (1st) 110541, ¶ 15.

¶ 57    Before addressing plaintiffs' challenge, we briefly note plaintiffs' remark that the motion to strike "did not specify which allegations are immaterial or superfluous" and that the trial court "did not specify which allegations were to be stricken."  Technically, if this assertion were true, plaintiffs would not even have known that the allegations stricken were those concerning post-rape events.  In any case, the motion to strike did in fact identify precisely which paragraphs it covered, and the trial court was clear that it was granting the motion in its entirety.

¶ 58    On the merits, plaintiffs claim that the reactions of FCCD and James to Jane's disclosure of the alleged rape and Coe's arrest for it are relevant to show that they acted willfully and wantonly *prior* to the rape.  According to plaintiffs, those allegations "not only support a pattern of behavior by [FCCD] and James to willfully ignore Inappropriate conduct but also help demonstrate an ongoing disregard for Jane Doe's welfare[.]"  We disagree.  The allegations in question portray FCCD and James as mistaken that FCCD had a safety policy in force, as hesitant to accept Jane's accusations against Coe, and as unwilling to immediately remove Coe

2018 IL App (2d) 170435

from contact with youth. Plaintiffs see this conduct as a "pattern" of indifference that predated the alleged rape, but in fact the conduct is perfectly consistent with FCCD and James having not acted wrongly prior to the alleged rape. "[A] fact is 'relevant' if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v. Pawlaczyk*, 189 Ill. 2d 177, 193 (2000). The alleged actions of FCCD and James following Jane's accusations and Coe's arrest are simply neutral on the question of whether those parties acted culpably prior to the alleged rape. Consequently, the allegations are immaterial and were properly stricken. Notably, even if the court had denied the motion to strike, we would still have considered the allegations irrelevant to whether the complaint stated a cause of action for willful and wanton conduct.

¶ 59                    B. Dismissal of the Second Amended Complaint

¶ 60                    1. Review of a Dismissal under Section 2-615 of the Code

¶ 61    The following principles guide our review of a dismissal under section 2-615 of the Code:

"A motion to dismiss brought pursuant to section 2-615 of the Code attacks the legal sufficiency of the complaint. [Citation.] When ruling on such a motion, the court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inferences that may arise from them. [Citation.] However, a court cannot accept as true mere conclusions unsupported by specific facts. [Citation.] A complaint should be dismissed under section 2-615 only if it is clearly apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to recover. [Citation.] The critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action on which relief may be granted.

- 20 -

[Citation.] Our review of an order granting a section 2-615 motion to dismiss is *de novo*." *In re Estate of Powell*, 2014 IL 115997, ¶ 12.

¶ 62                    2. General Principles Governing a Negligence Claim

¶ 63    Plaintiffs' claims against FCCD and James are all common-law negligence claims, even the claims of willful and wanton conduct, which is a species of common-law negligence (*Doe-3*, 2012 IL 112479, ¶ 19). To state a cause of action for common-law negligence, the plaintiff must plead facts establishing (1) a duty of care owed to the plaintiff by the defendant, (2) the defendant's breach of that duty, and (3) injury to the plaintiff proximately caused by that breach. *Tyrka v. Glenview Ridge Condominium Ass'n*, 2014 IL App (1st) 132762, ¶ 44.

¶ 64    The specific issue on appeal is whether plaintiffs sufficiently alleged that FCCD and James owed Jane a duty to protect her from being raped by Coe. Unless a duty of care is owed, there can be no negligence. *Doe v. Boy Scouts of America*, 2014 IL App (2d) 130121, ¶ 36. Generally, one has no duty to protect another from the harmful acts of a third party. *O'Rourke v. McIlvaine*, 2014 IL App (2d) 131191, ¶ 19. Exceptions to this rule depend on the existence of a recognized "special relationship." *Id.* First, the special relationship can exist between the injured party and the party alleged to owe the duty. *Id.* These relationships include common carrier-passenger, innkeeper-guest, business invitor-invitee, and voluntary custodian-protectee. *Iseberg v. Gross*, 227 Ill. 2d 78, 88 (2007). Second, the special relationship can exist between the party who is the source of the harm and the party alleged to owe the duty. *O'Rourke*, 2014 IL App (2d) 131191, ¶ 19. Such relationships include parent-child and master-servant or employer-employee. *Id.*

¶ 65    Finally, a duty of care can exist even in the absence of a special relationship, where the defendant has voluntarily undertaken a duty. *Lewis v. Heartland Food Corp.*, 2014 IL App (1st) 123303, ¶ 14.

¶ 66    Here, plaintiffs claim the existence of both types of a special relationship and a voluntary undertaking. FCCD and James present their arguments monolithically except with respect to negligent hiring, the only cause of action that was not against them both.

¶ 67                              3. Negligent Hiring—FCCD only

¶ 68    Count XII of plaintiffs' second amended complaint alleged negligent hiring against FCCD. To state a cause of action for negligent hiring, the plaintiff must plead facts establishing that (1) the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons, (2) this particular unfitness was known or should have been known at the time of the hiring, and (3) this particular unfitness proximately caused the plaintiff's injury. *Van Horne v. Muller*, 294 Ill. App. 3d 649, 656-57 (1998), *aff'd in part & rev'd in part on other grounds*, 185 Ill. 2d 299 (1998).

¶ 69    There is no dispute on appeal that FCCD should have conducted a reasonable background check on Coe before hiring him. There is also no dispute that a reasonable background check would have included a reasonable search for Coe's online activity as it bore upon his fitness for the position of youth director. The dispute on appeal concerns what was feasible for FCCD to learn about Coe from an online search of the kind that plaintiffs alleged FCCD should have done prior to hiring him.

¶ 70    In their specific allegations within their negligent-hiring count, plaintiffs alleged that "[a] basic, cursory Google search into the online presence of Coe would have revealed Coe's activity, which included posting public photos of his own genitalia, on numerous pornographic websites,

such as, 'newbienudes,' 'motherless,' 'wouldyouhitthis,' 'ratemybody,' 'ratemymelons,' and 'datehookup,' among many others." In their general allegations, plaintiffs asserted that Coe's profiles on pornographic websites were maintained not under his given name but under the pseudonym " 'BluesGod88.' "

¶ 71     FCCD claims that there are two major deficiencies in plaintiffs' allegations pertaining to negligent hiring. First, FCCD asserts that plaintiffs "do not *** explicitly allege that Coe was visiting the [pornographic] websites before he was hired *** in May 2009." In reviewing the sufficiency of a complaint, we accept all reasonable inferences from the allegations. *Powell*, 2014 IL 115997, ¶ 12. In their specific allegations within the negligent-hiring count, plaintiffs alleged that Coe maintained profiles on pornographic websites "[a]t all times relevant," which we construe to include before Coe's hire. Moreover, the negligent-hiring claim implies, indeed depends on, the (alleged) fact that Coe maintained such objectionable online profiles before his hire.

¶ 72     Second, FCCD contends that, even if plaintiffs have alleged that Coe maintained the profiles prior to his hire, they have failed to establish how FCCD could have become aware of those profiles before hiring Coe. FCCD notes that Coe is alleged to have maintained the profiles under the pseudonym " 'BluesGod88,' " and FCCD questions how it could have become aware of those profiles prior to Coe's hire when it did not know his pseudonym. Plaintiffs alleged, however, that "[a] basic, cursory Google search" would have revealed Coe's profiles on pornographic websites. From this allegation we draw the reasonable inference that a search under Coe's given name would have revealed his pseudonym (which in turn would have led FCCD to the profiles on pornographic websites). Whether the search would indeed have revealed that information is a question of fact. At this stage of the proceeding, we merely accept

this well-pled allegation as true. See *Olson v. Hunter's Point Homes, LLC*, 2012 IL App (5th) 100506, ¶ 10 (on motion to dismiss complaint for fraud and misrepresentation in the sale of homes, it was a question of fact whether purchasers could have discovered the alleged misrepresentations in the exercise of ordinary prudence).

¶ 73    For these reasons, we reverse the dismissal of the negligent-hiring claim (count XII) against FCCD.

¶ 74                                4. Negligent Retention

¶ 75    Plaintiffs alleged negligent retention against both FCCD (count XIV) and James (count IX). To state a cause of action for negligent retention, the plaintiff must plead facts establishing that: (1) the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons, (2) the employer retained the employee in his or her employment even after the employer knew or should have known about the unfitness, and (3) the unfitness proximately caused the claimed injury. *Van Horne*, 294 Ill. App. 3d at 656-67. "[T]he particular unfitness of the employee must have rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Platson v. NSM, America, Inc.*, 322 Ill. App. 3d 138, 144 (2001).

¶ 76    Obviously, as the tort of negligent retention assumes the capacity of the defendant to have terminated the employment of the harming party, the tort does not apply outside the employment relationship. See *Doe*, 2014 IL App (2d) 130121, ¶ 40 (no cause of action for negligent retention where no employment relationship existed). Accordingly, since James was not Coe's employer, but rather both were employed by FCCD, we affirm the dismissal of count IX, the negligent-retention count against James.

¶ 77    As for the claim against FCCD, plaintiffs have failed to plead facts establishing that FCCD learned or should have learned during Coe's tenure that he had a particular unfitness for the position of youth director at FCCD.  For purposes of our analysis, knowledge held by an agent of FCCD is imputable to FCCD itself.  See *Bryant v. Livigni*, 250 Ill. App. 3d 303, 308-09 (1993).

¶ 78    To facilitate our analysis, we group as follows the allegations on which plaintiffs rely in claiming that FCCD had notice of misconduct by Coe.  The first group of allegations describes specific instances of misconduct, or patterns of misconduct, that Coe would "habitually" engage in, apparently during youth group meetings.  Plaintiffs alleged that Coe was "habitually alone" with, or he "habitually isolated," underage female members of the youth group.  Interestingly, plaintiffs appeared to imply at one point that another adult was present on some occasions when Coe engaged in misconduct: "During *many* of the times that Coe engaged in acts of sexual innuendo and suggestion and other forms of inappropriate physical and sexual conduct with Youth Group participants, Coe was the only adult present."  (Emphasis added.)  However, plaintiffs did not indicate which other adult was present on these occasions.

¶ 79    Also, plaintiffs repeatedly alleged that James or other persons affiliated with FCCD were present on FCCD's premises, including during youth group functions, "*to witness* Coe's Inappropriate interactions with Jane Doe" (emphasis added).  Even if, however, we interpreted this to mean that such persons actually witnessed "Inappropriate" conduct by Coe toward Jane (and were not just present on the premises when the misconduct occurred), we would hold that the allegations failed for lack of specificity as to what conduct was actually witnessed.  Conclusions of fact, such as of "Inappropriate" conduct, fail where, as here, they are not supported by specific allegations.  *Powell*, 2014 IL 115997, ¶ 12.  Thus, while this set of

allegations describes many outrageous acts by Coe, it simply does not establish that FCCD knew or should have known of Coe's malfeasance.

¶ 80   The second group of allegations, which describes Coe's conduct in settings other than youth group functions, likewise fails to establish notice to FCCD.  Plaintiffs alleged:

(a) On one occasion, Coe was in his office during normal business hours when he took and sent Jane a picture of his erect penis.  At the time, Coe's office door was fully open and he was waiting for a colleague to retrieve him for an employee meeting.

(b) Jane spent lengthy amounts of time alone with Coe during normal business hours, and during these visits Coe would routinely fondle and kiss Jane while the office door was fully open.

(c) "During the Confirmation event for the 2011 class at [FCCD], Coe allowed underage girls to sit on his lap and engaged in Inappropriate bodily contact[.]"

¶ 81   Regarding allegations (a) and (b), plaintiffs invite us to infer that someone must have witnessed Coe's behavior, given his brazenness in leaving the door fully open during normal business hours.  We decline the invitation.  Our standard of review directs us to make only *reasonable* inferences in judging the sufficiency of a complaint.  *Id.*  Given no concept of how Coe's office was configured or who was present at FCCD when these incidents occurred, it would be an overreach to make the inference that plaintiffs invite.

¶ 82   As for allegation (c), it does not indicate who was present for the "Confirmation event" and might have witnessed Coe's behavior.  Plaintiffs assert in their brief that "parents, staff and other members [of FCCD] [were] present" for the event, but this fact is not alleged in the complaint.  Plaintiffs also point to their allegation that, at the July 2013 church meeting following Coe's arrest, FCCD members complained to James about the "2011 Confirmation

Incident." Obviously, such notice to FCCD after the abuse and ultimate rape of Jane does not support a claim that FCCD should have terminated Coe prior to the abuse of Jane.

¶ 83　　The third group of allegations describes specific conduct of Coe that was observed by James or others affiliated with FCCD. Plaintiffs alleged:

　　　　(d) On three separate occasions, James saw Coe alone in his office with Jane, who was "either lying on a sofa or sitting on Coe's desk," and James left Coe alone with Jane. Plaintiffs provided no dates for these instances.

　　　　(e) In March 2013, at least one FCCD employee witnessed Coe alone with Jane in FCCD's audio-visual booth with the lights turned off.

　　　　(f) "Multiple adult [FCCD] employees, volunteers, or members" observed Coe alone in the sanctuary or in his office with underage female members of the youth group. Plaintiffs provided no dates here.

¶ 84　　As no dates were provided for allegations (d) and (f), they cannot establish notice to FCCD of a problem with Coe in time for FCCD to take action. Moreover, none of the incidents is sinister on its face. For instance, Coe and Jane were not alone together in just any darkened room, but in an audio-visual booth where low light or darkness would not have been unusual during, say, a production. Also, Jane's posture inside Coe's office suggests at most a sense of ease or familiarity. While the alleged instances might arguably have been violations of the SCP's two-adult policy, and indicate that Coe was not properly mindful of it, they do not in themselves suggest that Coe took an improper interest in Jane or other underage female members of the youth group.

¶ 85    The fourth and final set of allegations we consider are those in which plaintiffs' oft-repeated term "Inappropriate" bears much of the weight.  We quoted above the core allegations featuring the term (*supra* ¶ 43).  The following are representative paragraphs:

"273. Multiple adult employees, volunteers, or members witnessed behavior on the part of Coe toward minor females in the youth group that those adults found *unsettling and Inappropriate*.

274. Multiple adult employees, volunteers, or members received information from the children of [FCCD] regarding Coe's *Inappropriate* behavior toward minor females in the Youth Group that the [*sic*] made the children feel uncomfortable, weird, isolated, or frustrated.

\* \* \*

277. [FCCD] employees, volunteers, or members reported or discussed among themselves the *Inappropriate* attentiveness, behavior, or physical contact by Coe with female members of the Youth Group witnessed by those employees or volunteers.

\* \* \*

297. In June 2013, an [FCCD] volunteer was present during normal business hours at [FCCD] for the purpose of assisting with the VBS program.

\*\*\*

299. Within less than two days of witnessing the interaction between Coe and Jane Doe at VBS, the Volunteer recognized the interaction as *Inappropriate or dangerous*.

300. The Volunteer placed a phone call to Rev. James before the rape occurred to report the *Inappropriate* conduct and reported the *Inappropriate* conduct to Rev. James in a subsequent meeting." (Emphases added.)

Early in the complaint, plaintiffs defined "Inappropriate" to include:

"Inappropriate Content, Inappropriate Displays of Affection, Sexual Harassment and Sexual Exploitation, as defined by UCC policies and materials, as well as conduct or materials defined by Illinois law to be Grooming, Sex Offenses, Harmful to Minors, Obscene, Adult Obscenity or Child Pornography Internet Site."

"Illinois is a fact-pleading jurisdiction; although the plaintiff is not required to set forth evidence in the complaint, the plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action, not simply conclusions." *Rubin & Norris, LLC v. Panzarella*, 2016 IL App (1st) 141315, ¶ 26. Plaintiffs were required to specify the allegedly objectionable conduct. Adjectives such as "Inappropriate," "unsettling," and "dangerous" are not stand-ins for specific facts.

¶ 86 Plaintiffs rely on *Platson*, where we reversed the dismissal of the plaintiff's complaint for negligent supervision. The plaintiff was an intern at NSM, America, Inc. (NSM), when she was physically assaulted by NSM's employee Mark Eigenbauer, while he and the plaintiff were working alone together. Specifically, Eigenbauer grabbed the plaintiff's waist and pulled her to him. This caused her to fall to her knees, at which point Eigenbauer " 'forced himself on top of her and pressed himself against her.' " *Platson*, 322 Ill. App. 3d at 141-42. We held that the plaintiff sufficiently pleaded that NSM had been on notice that Eigenbauer posed a danger to the plaintiff. She alleged that Eigenbauer had on previous occasions rubbed and massaged her shoulders and brushed up against her body. She alleged that this behavior had been witnessed by

other employees, as well as supervisors, and that it was well known throughout the office that Eigenbauer would single her out for such touching. *Id.* at 141. We held that the plaintiff "adequately alleged a cause of action for negligent supervision based on NSM's failure to take reasonable measures to protect plaintiff from Eigenbauer once NSM was aware of Eigenbauer's inappropriate touching of plaintiff." *Id.* at 145.

¶ 87 The plaintiff in *Platson* did what plaintiffs here failed to do: allege specific behavior witnessed by the defendant's agents that was of a kind that put the defendant on notice of the assailant's dangerous tendencies. In all 70 pages of their complaint, plaintiffs failed to allege (1) specific misconduct that (2) was observed by FCCD's agents and (3) was of a nature that placed FCCD on notice of Coe's particular unfitness for the position of youth director.

¶ 88 For these reasons, we uphold the dismissal of the negligent-retention claims (counts IX and XIV) against FCCD and James.

¶ 89      5. Negligent Supervision/Custodial Relationship/Voluntary Undertaking

¶ 90 Counts VIII and XIII alleged, *inter alia*, negligent supervision against FCCD and James. To state a cause of action for negligent supervision, the plaintiff must plead facts establishing that: (1) the defendant had a duty to supervise the harming party, (2) the defendant negligently supervised the harming party, and (3) such negligence proximately caused the plaintiff's injuries. *Van Horne*, 294 Ill. App. 3d at 657. Negligent supervision applies not just in the employment context but wherever it is appropriate to find a duty to supervise. See, *e.g.*, *State Farm Fire & Casualty Co. v. Mann*, 172 Ill. App. 3d 86, 92 (1988) (alleged parental negligence in supervision of child). FCCD and James do not appear to contest that James, as senior pastor, had a duty to supervise Coe during their time together at FCCD.

¶ 91    Counts VIII and XIII are omnibus counts because they alleged sources for a duty of care other than the employment relationship between FCCD and Coe and the supervisory relationship between James and Coe.    First, plaintiffs alleged the existence of a voluntary custodial relationship between FCCD and Jane.    Such a relationship exists when one voluntarily takes custody of another so as to deprive the other of her normal opportunities for protection.    *Platson*, 322 Ill. App. 3d at 146.    Second, plaintiffs alleged that FCCD and James voluntarily undertook a duty to protect Jane.    "Pursuant to the voluntary undertaking theory of liability, one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking."    *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 239 (1996).

¶ 92    The counts alleged failures by FCCD and James to monitor both Coe's Internet activity at FCCD and his interaction with the members of FCCD's youth and confirmation groups. Prominent in these counts is the SCP.    Plaintiffs alleged that, when Coe exploited youth group members in the absence of another adult, all churches within the IUCC were required to follow the SCP, which mandated that "at least two adults be present to supervise any minor youth or child activities."    Plaintiffs alleged that FCCD and James violated the two-adult policy by allowing Coe to conduct youth activities with no other adult present and that Coe used that unsupervised access to abuse Jane and other youths.

¶ 93    Critically, the trial court overlooked the fact that the claims in counts VIII and XIII are not premised on notice to FCCD and James of Coe's misconduct or the potential for it.    Liability is based on a duty to supervise that plaintiffs alleged existed independently of what was known or should have been known about Coe himself.    Moreover, under Illinois law, neither negligent

supervision nor the other causes of action alleged in counts VIII and XIII have as an essential element that the defendant have notice of the unfitness of the party that caused the harm.

¶ 94   FCCD and James devote most of their brief to defending the trial court's specific and only rationale for dismissing plaintiffs' claims: that plaintiffs failed to allege that FCCD and James had notice that Coe had any particular unfitness.  As noted, these arguments miss the point of the omnibus negligent-supervision counts.  FCCD and James do reserve a small portion of their brief for an argument that at least in part pertains to those counts.  The argument is narrow, however.  Before reaching its merits, we briefly address a forfeiture claim that FCCD and James raise.  They contend that plaintiffs have forfeited any argument that FCCD and James voluntarily undertook a duty to protect Jane during the VBS program.  FCCD and James claim forfeiture on the basis that, in its section on voluntary undertaking, plaintiffs' response to the motion to dismiss their second amended complaint did not refer to the VBS program.  We reject the claim since FCCD and James cite no authority for it.  See Ill. S. Ct. R. 341(h)(7), (i) (eff. July 1, 2017) (arguments of the appellee containing no citation to authority are forfeited).

¶ 95   Moving to the substance, we note that FCCD and James do not appear to contest the existence of the special relationships alleged by plaintiffs.  What they argue, first, is that plaintiffs' allegations did not establish that FCCD and James voluntarily undertook to protect Jane or other youths through the SCP.  Second, they argue alternatively, and broadly with respect to any claim of negligence based on the SCP, that plaintiffs failed to establish that the rape of Jane was a reasonably foreseeable result of the alleged failures of FCCD and James to enforce the SCP.

¶ 96   For their first argument, FCCD and James cite case law for the principle that "[w]here the law does not impose a duty, one will not generally be created by a defendant's rules or internal

guidelines" (*Rhodes*, 172 Ill. 2d at 238). In *Rhodes*, the supreme court held that, assuming an individual found lying on the defendant railroad's property was a trespasser, the common law did not impose on the railroad a duty to check on his welfare. *Id.* at 228-37. The railroad had internal policies requiring that railroad and municipal police be summoned to check on reports of injured persons, but the court held that these policies did not of themselves create a duty of care. "Rather, it is the law which, in the end, must say what is legally required." *Id.* at 238.

¶ 97    In *Blankenship v. Peoria Park District*, 269 Ill. App. 3d 416, 422 (1994), cited in *Rhodes*, the appellate court held that the internal rules of the Peoria Park District requiring the presence of at least one lifeguard during an adult swim did not create a duty of care toward adult swimmers where "the Park District's common law duty to supervise the patrons of its swimming pool [did] not extend to adult swimmers."

¶ 98    Under *Rhodes* and *Blankenship*, a defendant's internal policies do not create a duty of care that the law would not otherwise impose. In those cases, there was no special relationship upon which to base a duty of care, and the courts held that the defendants' internal policies did not of themselves give rise to a duty. In the present case, FCCD and James do not appear to dispute the existence of the special relationships alleged by plaintiffs. Moreover, we hold that, under the facts alleged, the law imposed on FCCD and James a standard of care co-extensive with the two-adult policy of the SCP.

¶ 99    The nature and scope of the two-adult policy plainly reveals the concerns that motivated the IUCC in imposing the SCP on all churches within the conference. The two-adult policy requires that "at least two adults be present to supervise *any* minor youth or child activities" (emphasis added). Evidently, the IUCC did not believe that it was enough to provide adult co-leaders just for those adults who the church had specific reason to know were capable of abuse

(assuming such adults would even be permitted to serve). Rather, the IUCC must have believed that the general risk of the sexual abuse of children within settings like church youth activities warranted a precautionary measure for *all* such activities. See *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245, ¶ 50 (in suit based on death caused by restaurant franchisee's pizza delivery driver, franchisor's standards for delivery drivers formed the standard of care, where, *inter alia*, the standards evinced the franchisor's own belief in the general foreseeability of accidents caused by drivers with poor driving records). Indeed, it is, in our view, generally foreseeable that abuse will occur in programs providing adults with unsupervised access to children, for it is well known that pedophiles are drawn to such opportunities, in churches and elsewhere. See Federal Judicial Center, *Handbook for Working with Defendants and Offenders with Mental Disorders*, 80 (3rd ed., 2003) ("Pedophiles will seek employment and volunteer work that gives them access to children. Examples are teacher, clergyman, police officer, coach, scout leader, Big Brother, or foster parent. The pedophile will also find ways to get the child into a situation where other adults are absent."). The existence of a duty "turns largely on public policy considerations." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 391 (2004). Public policy in Illinois favors the protection of children. *Doe-3*, 2012 IL 112479, ¶ 36. The statutes of this state also manifest "a specific policy *** which favors, in particular, the protection of children from sex offenders." *Id.* ¶ 37. In deference to this policy, we hold that FCCD and James had a duty of care requiring them to enforce the SCP's two-adult policy, regardless of their actual or constructive knowledge of Coe's predatory potential.

¶ 100 Having so held, we can reject in short order FCCD and James's second argument, on foreseeability. Here they revert to their approach on the negligent-retention counts: since plaintiffs failed to allege that FCCD was or should have been aware of any specific misconduct

by Coe leading up to the rape of Jane, they failed to establish that Jane's rape was reasonably foreseeable. As explained, this argument is inapposite to the claims in the omnibus negligent-supervision counts.

¶ 101   At oral argument, counsel for FCCD and James argued that not every violation of the two-adult policy alleged in the complaint made it reasonably foreseeable that Coe would rape Jane. For instance, counsel pointed to the alleged occasions when James witnessed Coe alone with Jane in his office. We agree that these instances were apparently innocuous, at least as described in the complaint. This is beside the point, however. The IUCC obviously fashioned the two-adult policy in the belief that even the most apparently virtuous adult should not be left alone with children, because it is generally foreseeable that abuse will occur in such a setting. The IUCC did not intend for the two-adult policy to be enforced on a rolling, case-by-case basis. We hold that the common law of this state, whose public policy strongly favors the protection of children, required FCCD and James to enforce the two-adult policy as the IUCC intended.

¶ 102   For these reasons, we reverse the dismissal of counts VIII (James) and XIII (FCCD), the omnibus negligent-supervision counts.

¶ 103                              6. Willful-and-Wanton Counts

¶ 104   Counts X, XI, XV, and XVI alleged willful and wanton conduct against FCCD and James, specifically, "willful and wanton failure to protect" and "willful and wanton retention and failure to supervise." These counts overlap in part with the negligence counts against FCCD and James. Willful and wanton conduct is an aggravated form of negligence. *Id.* ¶ 19. Consequently, we uphold the dismissal of the willful-and-wanton counts to the extent that they overlap with the negligent-retention counts. However, we reverse the dismissal of the willful-

and-wanton counts to the extent that they overlap with the omnibus negligent-supervision counts. Whether a defendant has acted willfully and wantonly is a question of fact. *Id.* ¶ 45.

¶ 105                                     7. Summary

¶ 106   For the foregoing reasons, we (1) affirm the trial court's decision to strike portions of plaintiffs' first amended complaint, (2) reverse the dismissal of the negligent-hiring count (XII) in plaintiffs' second amended complaint, (3) affirm the dismissal of the negligent-retention counts (IX and XIV) and of the willful-and wanton-counts (X, XI, XV, and XVI) insofar as they overlap with the negligent-retention counts, and (4) reverse the dismissal of the omnibus negligent-supervision counts (VIII and XIII) and of the willful-and-wanton counts to the extent that they overlap with the negligent-supervision counts.

¶ 107                                     III. CONCLUSION

¶ 108   The judgment of the circuit court of Kane County is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

¶ 109   Affirmed in part and reversed in part.

¶ 110   Cause remanded.